**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION**

|  |  |
|---|---|
| **DJON KELLY, individually and on behalf of all others similarly situated,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 1:25-cv-383** |
| **UNDERDOG SPORTS, LLC d/b/a Underdog Fantasy,** | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## CLASS ACTION COMPLAINT

Plaintiff Djon Kelly ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant Underdog Sports, LLC d/b/a Underdog Fantasy ("Defendant" or "Underdog"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

## NATURE OF THE CASE

1.  This case arises out of Defendant's operation of an illegal sports betting platform masquerading as Daily Fantasy Sports ("DFS") contests.

2.  Defendant owns and operates one of the most popular and profitable online and app-based fantasy-sports platform, Underdog, available at https://www.underdogfantasy.com.

3.  Underdog, for years, has falsely represented to consumers and the public that its DFS contests is legal and legitimate in Alabama. But in reality, Defendant owns and operates an unlicensed sports betting platform. By operating unlicensed sports betting, Defendant has violated Alabama laws, engaged in illegal deceptive active, and unjustly enriched itself to the tune of

millions of dollars.

4.      DFS platforms entice consumers to choose fantasy teams of real-world athletes and pit those teams against teams created by other participants. The outcome—who "wins" and who "loses"—is dictated not by chance, but by the actual, real-world performance of the athletes on the fantasy teams.

5.      Underdog allows users to access "games" that are not "fantasy." But these are not fantasy games. Instead, these games are plainly illegal online sports bets. For example, Defendant's platform allows consumers to wager on how individual real-world athletes will perform against performance benchmarks unilaterally set by Defendant. Consumers, in most cases, are not competing against one another, but in reality, they are betting against the house—Underdog—who sets sophisticated betting lines designed to ensure its own profit. Nor is it "fantasy," because consumers are not betting on imaginary teams of athletes, but simply betting on the performance of real-world athletes.

6.      Thus, in truth, the "fantasy sports" contests are, undoubtedly, online sports betting.

7.      To deceive consumers, Underdog has branded itself as a "fantasy sports" platform, which is simply a title to mislead regulators and consumers into believing it offers harmless gameplay instead of unlawful sports betting.

8.      Underdog players deposit money, stake entry fees, and win or lose depending entirely on the uncertain performance of third-party athletes in real-world professional and collegiate sporting events.

9.      Alabama law flatly prohibits sports betting. Ala. Code § 13A-12-20(2) makes it illegal to participate in "advancing gambling activity by unlawfully accepting bets from members of the public as a business" of any contest, game, gaming scheme, or gaming device in which the

CLASS ACTION COMPLAINT

outcome depends in a material degree upon an element of chance. Ala. Code § 13A-12-20(3). Regulators in other states have reached the same conclusion. For example, the California Attorney General recently confirmed that DFS contests, including Pick'em and Draft Style formats, fall squarely within this prohibition and constitute unlawful gambling.

10.    Underdog profits by offering these unlawful contests to Alabama consumers. It collects entry fees, retains a guaranteed rake from every contest, and structures payouts so that the overwhelming majority of players lose money. By operating and profiting from illegal gambling, Underdog violates Alabama's gambling laws.

11.    Underdog compounds the illegality by deceptively marketing its contests as "fantasy sports" and "games of skill," while concealing their true nature as proposition and parlay wagers. Reasonable consumers are misled into believing they are participating in lawful fantasy sports contests when in fact they are placing unlawful sports bets against the house.

12.    Online sports betting is highly addictive and strictly regulated in Alabama.

13.    Plaintiff, individually and on behalf of all other similarly situated, brings this action to stop Underdog from unlawfully operating sports-betting contests in Alabama and to secure restitution and damages for consumers who paid entry fees into these illegal games.

## PARTIES

14.    At all times material hereto, Plaintiff has been a resident of Mobile County, Alabama.

15.    Defendant is a company formed in Delaware and with its headquarters at 11242 Delano St., North Hollywood, California 91606. Underdog Sports, LLC d/b/a Underdog Fantasy owns and operates an  illegal sports betting platform and app under the brand "Underdog." Underdog Sports LLC conducts business within the venue of this District and throughout Alabama

generally, which website, apps and operations are not permitted and are illegal under Alabama law.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff and one defendant.

17.    This Court has personal jurisdiction over Defendant because, as further described below, Defendant does business and is authorized to conduct business here. Defendant sells its products to consumers in Alabama, including to Plaintiff.

18.    Moreover, Defendant conducts business in Alabama and actively disseminates targeted advertisements within the state with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in Alabama, and/or otherwise intentionally avails itself of the Alabama market.

19.    Defendant has purposefully directed its activities toward this District.

20.    Defendant has purposefully availed itself of the privileges of conducting activities in this District.

21.    Defendant's claim arises out and relates to Defendant's forum-related activities.

22.    The exercise of jurisdiction over Defendant is reasonable.

23.    Upon information and belief, Defendant localizes its game for each market where it is distributed, including the United States. This localization includes changes to the language and currency presented in Underdog.

24.    Upon information and belief, Defendant has made millions of dollars from thousands

of Alabama residents, most of which are repeat purchases by the same customers, by contracting with the customers to place wagers and other goods in exchange for legal tender.

25.     Defendant facilitates ongoing economic activity between thousands of Alabama players and Defendant.

26.     Upon information and belief, Defendant directly controls whether consumers in Alabama can complete purchases from Underdog.

27.     Upon information and belief, Defendant has the capability to determine where its customers are from, including whether purchases are being made from Alabama.

28.     Upon information and belief, Defendant has the capability to prevent Alabama residents from completing purchases or placing wagers in Underdog, but has chosen to accept those purchases and wagers from Alabama residents. For example, other gambling applications prevent transactions from residents of states where gambling is unlawful.

29.     Upon information and belief, Defendant has taken no steps to restrict Alabama residents' access to Underdog or to restrict the ability of Alabama residents to make purchases from Underdog .

30.     Defendant aggressively advertises Underdog in the United States, including in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

31.     Upon information and belief, these advertisements for Underdog were designed and directed to attract consumers in the United States, including this District, to play Underdog .

32.     Upon information and belief, Defendant has the capability of targeting its Underdog advertisements by geography and the capability of excluding residents of Alabama from the reach of Defendant's advertisements for Underdog .

CLASS ACTION COMPLAINT

33.     Upon information and belief, Defendant partners with Meta Platforms, Inc. to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in Underdog, including residents of Alabama. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in Alabama.

34.     Upon information and belief, Defendant has taken no steps to restrict its advertisements for Underdog  from reaching residents of Alabama.

35.     Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in Underdog occurred in this District.

36.     Plaintiff alleges, upon information and belief, that Defendant conducts professional and commercial activities in Alabama on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

37.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within Alabama, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

38.     The amount in controversy exceeds the jurisdictional minimum of this Court.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.     *The Problem of Online Sports Betting*

39.     Gambling addiction in the United States has escalated into a significant public health

crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

40.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[1] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[2]

41.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[3] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[4]

42.     Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[5]

43.     Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-

---

[1] UC SAN DIEGO TODAY, https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction -following-legalization-of-sports-betting?utm_ (last visited July 29, 2025).

[2] *See id.*

[3] Clea Simon, *Gambling problems are mushrooming*, THE HARVARD GAZETTE, https://news. harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-no w/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20th at%20about%202.5,of%20callers%20is%20skewing%20younger. (last visited July 29, 2025).

[4] WORLD HEALTH ORGANIZATION, https://www.who.int/news-room/fact-sheets/detail/gambling #:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last visited July 29, 2025).

[5] Cait Huble, *NCPG Statement on the Betting on Our Future Act*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last visited July 29, 2025).

seeking nationally, with 180,000 monthly searches at its peak.[6]

44.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[7] Online sports betting platforms have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as count-down timers to pressure users into placing hasty bets.

45.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

46.    In Alabama, it is to illegal to wager on sports. In this regard, Alabama has a long history of regulating attempts to win money based on the outcome of sporting events.

## II.    Alabama Law Flatly Prohibits Sports Wagering.

47.    Alabama has long prohibited sports wagering as a matter of statute and deep-rooted public policy.

48.    Since statehood, Alabama has strictly regulated and prohibited gambling activities that involve staking money on uncertain events. Article IV, § 65 of the Alabama Constitution bans lotteries, directs the Legislature to prohibit "lotteries or gift enterprises for any purposes," and mandates statutory safeguards against unauthorized forms of gambling.

49.    Consistent with these constitutional commands, Ala. Code § 13A-12-20(1), which prohibits wagering on sports, makes it unlawful to "engage in conduct that materially aids any form

---

[6] UC SAN DIEGO TODAY, https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last visited July 29, 2025).

[7] Wayne Parry, ASSOCIATED PRESS, *Poll shows young men in the US are more at risk for gambling addiction than the general population,* https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last visited July 29, 2025).

of gambling activity ." Ala. Code § 13A-12-20(2), makes it unlawful to "advance gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcome of future contingent events." Likewise, Ala. Code § 13A-12-20(4), states that "a person engages in gambling if he stakes or risks something of value upon the outcome of a contest of change or a future contingent event not under his control or influence…"

50.    In 2016, the Alabama Attorney General reviewed the legality of DFS contests and issued cease-and-desist letters to DraftKings and FanDuel, determining that "paid daily fantasy sports contests constitute illegal gambling."[8]

51.    The Attorney General explained that while DFS contests involve some degree of skill, "the results … depend to a large degree on chance," and thus fall within the statutory definition of gambling.[9]

52.    Alabama courts consistently construe this prohibition broadly. The Supreme Court of Alabama, in *Barber v. Jefferson Cnty. Racing Ass'n Inc.*, 960 So. 2d 599, 615–16 (Ala. 2006), emphasized under Ala. Code § 13A-12-20(4), that gambling exists whenever a person risks something of value on the outcome of a contest of chance or a future contingent event, regardless of whether skill or judgment play a role.

53.    Alabama has carved out limited statutory exceptions—none of which are applicable here—but otherwise bans all forms of sports betting.

### III.    *"Pick'Em" Contests Are Nothing More Than Proposition Bets*

54.    In "pick'em" contests, players wager on the performance of specific athletes on

---

[8] AlabamaAG.gov, *Attorney General Determines Paid Daily Fantasy Sports Contests are Illegal Gambling*, https://www.alabamaag.gov/attorney-general-determines-paid-daily-fantasy-sports-contests-are-illegal-gambling/ (last visited September 3, 2025).

[9] *Id.*

specified statistical metrics. For example, a player may be asked to predict whether Steph Curry will score more than 20 points, or whether Jimmy Butler will collect more than 7 rebounds, in a given game.

55.    Pick'em contests violate Ala. Code § 13A-12-20(1) because entry fees are bilateral wagers between the consumer and the operator: the operator sets thresholds, the consumer pays money to predict whether the outcome will be above or below the line, and both sides have a direct financial stake in the outcome of the game. And the real-world sporting events clearly constitute contests of skill.

56.    Pick'em contests are materially indistinguishable from proposition or parlay bets offered by traditional sportsbooks. Regulators in California, Virginia, Arizona, and Florida have explicitly categorized pick'em as "proposition betting," one of the most common and recognized forms of sports wagering.[10]

57.    Indeed, state regulators across the country have repeatedly determined that DFS contests—including Underdog's pick'em contests—are illegal gambling or unlicensed sports wagering, issuing cease-and-desist orders and enforcement actions in Florida, Arkansas, and New York, among others.[11] Collectively, these regulatory actions demonstrate that sate enforcement agencies and Attorneys General across the United States have consistently recognized Underdog's pick'em contests and similar DFS products as illegal gambling or unlicensed sports betting.

58.    Operators also cannot avoid liability by claiming that pick'em contests involve

---

[10] *See, e.g.*, Cal. Att'y Gen., Op. No. 23-1001 (July 3, 2025), 2023 Ops. Va. Atty. Gen. 133 (Dec. 12, 2023); Wyoming Gaming Commission, letter to PrizePicks, July 5, 2023; Florida Gaming Control Commission, letter to Betr, Sept. 19, 2023.

[11] *See, e.g.*, https://flregwatch.com/wp-content/uploads/2023/09/DOC.pdf (Florida); https://www.dfa.arkansas.gov/news/dfa-issues-cease-and-desist-regarding-unlicensed-sports-betting/ (Arkansas); https://gaming.ny.gov/system/files/documents/2025/03/03.14.25.underdogsettlement.pdf (New York).

outcomes other than the final score of the game, such as an athlete's point total or rebounds collecting. Under Ala. Code § 13A-12-20, gambling includes staking something of value on the outcome of a "contest of chance" or "future contingent event not under one's control," and bookmaking occurs when bets are accepted from the public as a business. Proposition betting on individual player performances is squarely within the statute.

### IV.    *Daily Fantasy Sports Are Merely a Digital Reincarnation of Illegal Sports Betting*

59.    The mechanics of DFS mirror those of traditional sports wagering that Alabama law has long prohibited. Like traditional sportsbooks, DFS operators induce consumers to stake money on the uncertain performance of real-world athletes in real-world sporting events.

60.    DFS "pick'em" contests replicate typical proposition bets, requiring consumers to predict whether individual athletes will exceed or fall below a statistical line set by the operator. This s no different from a sportsbook bet on whether a player will score a certain number of points or rebounds in a given game.

61.    Similarly, Pick'em Champion contests replicate parlay wagering, in which bettors make multiple over-under predictions simultaneously.

62.    In both formats, players pay entry fees that constitute wagers because they are promises to give money depending on the outcome of uncertain future sporting events. Just as in traditional sports betting, players do not control or influence the athletic contests; they merely bet on them.

63.    Thus, DFS contests, like Underdog's, constitute nothing more than unlawful sports betting disguised as fantasy games. Indeed, it is simply the latest iteration of sports betting—delivered and gamified through addictive mobile apps instead of racetracks or betting parlors—that Alabama law has long outlawed to shield consumers from the well-documented, historical dangers

of gambling.

### V.    Underdog Uses "Daily Fantasy Sports" Contests to Disguise Illegal Sports Betting.

64.    Defendant Underdog operates a website and mobile application available in Alabama that offers consumers the ability to deposit real money, enter paid contests, and win cash prizes based on the real-world performance of professional athletes.

65.    Underdog advertises itself as a "fantasy sports" platform to avoid gambling regulations and trick potential players into believing that it offers legal contests. But this is false. In reality, Underdog's contests are structures as sports wagers prohibited by Alabama law. Players risk money on uncertain athletic outcomes, and Underdog, as the operator, profits by retaining a portion of the entry fees paid by consumers.

66.    Players can access Underdog either through the internet website or on Apple and Android devices in the United States through the App Store and Play Store, respectively.

#### a.    Underdog's "Pick'em" Contests

67.    In Underdog's "Pick'em" contests, users are prompted to select statistical thresholds based on an athlete's performance— for example, whether Steph Curry will score "over or under 28.5 points" or whether Tom Brady will record "over or under 85.5 rushing yards."

68.    After making their selections, users place an entry fee of their choosing. The amount wagered dictates the size of the potential payout, which increases with the number of predictions bundled together. For example, a $20 entry predicting two outcomes may return $60 if both are correct, while a five-pick entry may pay out 20 times the entry fee if every prediction hits.

69.    The structure of these contests mirrors proposition betting offered by sportsbooks. Players are not competing against one another in a game of skill. Instead, and in reality, they are betting directly against Underdog, who sets the "lines" for each athlete's statistical performance.

70.     The operator has a direct financial interest in the outcome: if a consumer's predictions are wrong, Underdog retains the entry fee; if correct, Underdog pays out winnings based on a pre-set schedule it controls.

71.     These mechanics are indistinguishable from traditional sports wagers in that the results of the Pick'em contests are contingent and unknown at the time the bets and wagers are collected and recorded by Underdog.

### b.     Underdog's "Pick'em Champions" Contests

72.     Underdog also offers players to participate in their "Pick'em Champions" contest wherein users compete against each other by choosing up to eight players' stats, and decide whether they will go higher or lower than Underdog's projected performance metrics. Players select entry fees and then watch along in real time to see if their entry hits in a contest with other players. Payouts are dictated by the player's champions points. Underdog collects the sums wagered by users and pools the bets together into a "prize pool" similar to a "pot" in poker.

73.     No matter the type of contest, all adhere to the same format: players place bets with Underdog regarding the expected future actual performance of athletes in real-world sporting events. Underdog collects the sums wagered by users and pools the bets together into a "prize pool" similar to a "pot" in poker. Underdog tracks all of the bets on its own ledger like a traditional betting book. Then, after the underlying, real-world sporting event occurs, Underdog will pay out the winners based on their records and the outcome of the actual sporting event.

74.     Underdog retains a percentage of the pooled entry fees ensuring that the operator profits regardless of consumer outcomes.

75.     These "Pick'em Champions" contests are not harmless competitions. Players are not competing in sporting events themselves but are wagering money on the performance of athletes

over whom they have no control. As described above, regulators and courts have consistently recognized such contests as indistinguishable from parlay or horse-race betting.

76.     Underdog markets its contests as games of skill. In reality, however, they are wagers on the uncertain future performance of athletes in professional sporting events, precisely the type of conduct Alabama law prohibits.

### c.   *Underdog Profits from Illegal Sports Betting*

77.     Across both contest formats, Underdog's business model depends on consumers staking real money on the uncertain outcomes of professional sporting events.

78.     Underdog profits by setting statistical thresholds, structuring payouts to favor the house, and retaining a percentage of entry fees. The overwhelming majority of participants lose money, while Underdog reaps substantial revenue from illegal sports wagering.

79.     By disguising sports betting as "fantasy sports," Underdog misleads consumers into believing they are participating in lawful contests. In truth, Underdog's mobile app offers nothing more than illegal sports betting in violation of Alabama law.

## VI.   *Underdog Deceptively Markets Illegal Sports Betting as "Fantasy Sports"*

80.     Underdog markets its website and mobile app to consumers as a "fantasy sports" platform, creating the false impression that its contests are lawful, skill-based games rather than prohibited sports wagering.

81.     On its website and within the app store descriptions, Underdog repeatedly refers to its contests as "fantasy," "games of skill," and "entertainment," despite the fact that participants stake real money on the uncertain, short-term statistical performance of professional athletes in real-world sporting events.

82.     Underdog's "Pick'em" contests are marketed as causal fantasy games where

CLASS ACTION COMPLAINT

consumers "choose higher or lower" on player statistics, but the operator fails to disclose that those mechanics are identical to parlay or proposition betting lines offered by traditional sportsbooks.

83.     A reasonable consumer, seeing Underdog marketed as a fantasy sports app in the Apple App Store or Google Play Store, would be misled into believing the contests offered are lawful and materially different from traditional sports betting.

84.     In truth, Underdog's contests are unlawful gambling prohibited by Alabama law. Alabama's criminal code makes it unlawful to "advance gambling activity by unlawfully accepting bets from members of the public as a business" on "any contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance." Ala. Code § 13A-12-20(2). By misrepresenting and concealing the true nature of its contests, Underdog engages in fraudulent and deceptive conduct that violates the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5 *et seq*.

### VII.    *All Purported Contracts with Defendant Are Void*

85.     There are two independent and legally sufficient grounds upon which any purported contract with Defendant is void and unenforceable.

86.     In Alabama, "[a]ll contracts founded in whole or in part on a gambling consideration are void." Ala. Code §8-1-150 (2024).

87.     Thus, no contract was ever formed between the parties, and any purported contract between Plaintiff and Defendant, and any contractually based defenses Defendant may raise are likewise void.

88.     And the *entire* contract is void, because "even if the arbitration provision is severed from the rest of any 'contract,' the arbitration provision itself is void as a matter of law pursuant to § 8–1–150." *Macon Cnty. Greyhound Park, Inc. v. Hoffman*, 226 So. 3d 152, 167 (Ala. 2016).

89.     Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

90.     Parties cannot contractually agree to engage in conduct that is criminal or otherwise contrary to public policy. Just as a person cannot lawfully contract to engage in forced labor, sex trafficking, illicit drug sales, or other illegal conduct, neither can they enter into a valid and enforceable agreement to participate in unlawful gambling. Any purported contractual relationship between Plaintiff and Defendant—premised on participation in illegal gambling activity—is therefore void ab initio.

91.     Accordingly, Plaintiff hereby voids any purported agreement or contract between herself and Defendant. As a result, Defendant may not invoke any contractual defenses—including arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or enforceable agreement exists.

## **FACTS SPECIFIC TO PLAINTIFF**

### *Plaintiff Djon Kelly's Experience*

92.     In response to advertisements seen on social media and television, Plaintiff created an account with Underdog on or around late 2024. Plaintiff played Underdog from approximately late 2024 to July 2025 during which he participated in Pick'em and/or Pick'em Champions contests.

93.     Underdog represented to Plaintiff that the products and services it offered in Alabama were legal. Underdog never disclosed that its "Daily Fantasy Sports" were in actuality illegal sports wagers.

94.     In downloading the app and signing up for an account, Plaintiff expressly relied on Underdog's representations that the services were legal in Alabama

95.     Plaintiff accessed Underdog and placed all of his wagers in Underdog in Alabama.

96.     Plaintiff placed numerous bets on Pick'em and/or Drafts through Underdog's app. Overall, Plaintiff wagered and lost approximately $4,000.00.

97.     Underdog never informed Plaintiff of the true nature of its DFS contests were actually illegal sports bets. Had Underdog honestly and accurately disclosed the unlawful nature of its online platform, Plaintiff would have never signed up for Underdog or paid Underdog any money.

98.     As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

99.     Plaintiff enjoys playing legal DFS and has an ongoing interest in playing Underdog if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore has an ongoing interest in Underdog complying with state and federal gambling laws and consumer protection statutes.

## CLASS ALLEGATIONS

100.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

101.    The Class is defined as follows:

> All Alabama residents who, during the applicable limitations period, played and lost money wagering on Defendant's online Daily Fantasy Sports platform.

102.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

103.    **Commonality.** There are many questions of law and fact common to the claims of

Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

      a.  Whether the DFS contests in Underdog are illegal sports wagering as defined under Alabama law;

      b.  Whether Defendant engaged in the conduct alleged in the Complaint;

      c.  Whether Defendant violates the statutes listed below in Count I;

      d.  Whether Defendant violated statutes analogous to those alleged herein applicable;

      e.  Whether and how Defendant manipulates the odds in games offered in Underdog;

      f.  Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

      g.  Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

104.  **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were all players of Underdog who deposited monies and wagered monies as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

105.  **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Plaintiff has retained counsel with substantial experience in

prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

106.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

107.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT
## 28 U.S.C. §§2201 et seq.

108.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-107 of this Complaint.

109.    Plaintiff brings this count individually and on behalf of all other Class members.

110.    Alabama law strongly prohibits any form of gambling.

111.    In fact, gambling is constitutionally prohibited. Ala. Const., Art. IV, §65.

112.    In Alabama, gambling occurs when one "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under her control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome." ALA. CODE § 13A-12-20(4).

113.    In Alabama, "Something of value" is defined as "[a]ny money or property, ... or article exchangeable for money or property or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein or involving extension of a service entertainment or a privilege of playing at a ... scheme without charge." ALA. CODE § 13A-12-20(10).

114.    In Alabama, a game is chance-based, not skill-based, when more chance is involved in the outcome than skill. Underdog operates an illegal gambling website wherein participants pay consideration for the chance to win money.

115.    The prizes Defendant offers are valuable and can be used as or converted into US currency.

116.    Defendant operates, in effect, an illegal online sports betting platform. And just because Plaintiff and Class members can enter some contests for free does not save Defendant. The Alabama Supreme Court has long held that the availability of free chances is not necessarily dispositive of whether the game, or contest, is a gambling scheme: "That the prize may go to someone who has paid nothing does not negative the fact that many have paid for their chance. Because some have not been drawn into the gambling phase does not render it any the less a lottery, with whatever of evil it engenders, as to the large public who have paid." *Barber v. Jefferson Cnty. Racing Ass'n, Inc.*, 960 So. 2d 599, 614 (Ala. 2006) (*quoting Grimes v. State*, 178 So. 73, 74 (Ala. 1937)).

117.    Plaintiff and Class members seek an order declaring that (1) Underdog is illegal gambling in Alabama and (2) any authority under which it purports to operate is unconstitutional, as well as a permanent injunction enjoining Defendant from operating Underdog in Alabama, with disgorgement of profits.

118.    Plaintiff and Class members also seek a speedy declaratory judgment hearing pursuant to Fed. R. Civ P. 57.

<u>**SECOND CAUSE OF ACTION**</u>
**ALABAMA GAMBLING LOSS RECOVERY STATUTE**
**Ala. Code §§ 8-1-150, *et seq.***

119.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–107 by reference as if fully set forth herein.

120.    Plaintiff brings this count individually and on behalf of all other Class members.

121.    Plaintiff is similarly situated as other Class members, as each are Alabama residents who have either paid and lost money or other things of value on Defendant's DFS platform in the last six months, or are the spouse, child, or next of kin of an Alabama resident who paid and lost money or other things of value on Defendant's DFS platform in the last six months.

122.    Defendant operates an illegal gambling website that is accessible in Alabama.

123.    In the last six months, Plaintiff and other Class members paid and lost money or other things of value to Defendant while using Underdog.

124.    Plaintiff and other Class members demand recovery of the money or other things of value paid and lost to Defendant in the last six months in an amount to be determined at trial, including interest.

125.    Plaintiff also seeks recovery of money or other things paid and lost on Defendant in the last twelve months on behalf of the spouses, children, and next of kin of the losers.

### THIRD CAUSE OF ACTION
### ALABAMA DECEPTIVE TRADE PRACTICES ACT
### Ala. Code §§ 8-19-5, *et seq.*

126.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–107 by reference as if fully set forth herein.

127.    The Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-5 et seq., prohibits "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." Ala. Code § 8-19-5(27). The statute is to be liberally construed to protect consumers from unfair, deceptive, and unconscionable business practices.

128.    Defendant Underdog operates and markets "pick'em" and other daily fantasy sports ("DFS") contests to Alabama consumers. In truth, these contests are unlawful gambling prohibited by Alabama law. *See* Ala. Code § 13A-12-20(2) (defining unlawful gambling as advancing gambling activity by accepting bets from members of the public in which the outcome depends in a material degree upon chance).

129.    Despite this prohibiton, Underdog misrepresents and conceals the true nature of its contests by falsely characterizing them as lawful "fantasy sports" games of skill. Such misrepresentations and omissions are material to consumers decisions to deposit and wager money with Underdog.

130.    Underdog's conduct constitutes multiple unfair and deceptive trade practices within the meaning of Ala. Code § 8-19-5, including but not limited to:

      a.    Misrepresenting that its contests are lawful when they are in fact illegal gambling (§ 8-19-5(5));

      b.    Engaging in conduct that is "unconscionable, false, misleading, or deceptive" in connection with consumer transactions (§ 8-19-5(27)); and

    c.   Failing to disclose material facts concerning the true nature and legality of its contests (§ 8-19-5(7)).

131.    Alabama's Attorney General has expressly determined that paid daily fantasy sports contests constitute illegal gambling under Alabama law. *See* Ala. Att'y Gen., Press Release, "Attorney General Determines Paid Daily Fantasy Sports Contests Are Illegal Gambling" (Apr. 5, 2016). This authoritative determination underscores that Underdog's representations to Alabama consumers are false and deceptive.

132.    Plaintiff and members of the Class have suffered ascertainable losses as a direct and proximate result of Underdog's unlawful and deceptive acts, including the loss of money wagered on Underdog's illegal contests.

133.    Pursuant to Ala. Code § 8-19-10, Plaintiff and the Class seek actual damages, treble damages where appropriate, attorneys' fees, and equitable relief including an order enjoining Defendant from continuing to operate its illegal contests in Alabama.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

CLASS ACTION COMPLAINT

4.  Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.  Awarding pre- and post-judgment interest, as allowable by law;

6.  For an order enjoining Defendant from continuing to engage in the wrongful acts and
    practices alleged herein;

7.  Declaratory and equitable relief, including restitution and disgorgement;

8.  For public injunctive relief as the Court may deem proper; and

9.  Awarding such further and other relief as the Court deems just, proper and equitable.

## <u>JURY DEMAND</u>

Plaintiff requests trial by jury of all claims that can be so tried.


Dated: September 12, 2025                    Respectfully submitted,


                                             */s/ David L. Selby, II*
                                             David L. Selby, II (ASB-6994-Y62D)
                                             BAILEY & GLASSER, LLP
                                             3000 Riverchase Galleria, Suite 905
                                             Birmingham, Alabama 35244
                                             T:      (205) 988-9253
                                             F       (205) 733-4896
                                             E:      dselby@baileyglasser.com

                                             Scott Edelsberg (*pro hac vice forthcoming*)
                                             EDELSBERG LAW, P.A.
                                             20900 NE 30th Ave., Suite 417
                                             Aventura, Florida 33180
                                             T:      (305) 975-3320
                                             E:      scott@edelsberglaw.com

                                             Edwin E. Elliott (*pro hac vice forthcoming*)
                                             SHAMIS & GENTILE, P.A.
                                             14 NE 1st Avenue, Ste. 705
                                             Miami, FL 33132
                                             T:      (305) 479-2299
                                             E:      edwine@shamisgentile.com

                                             *Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT